**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **LAURA PEEK**, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br>v.<br><br>**BEECH-NUT NUTRITION COMPANY**,<br><br>    Defendant. | Case No.  1:21-cv-0167 (TJM/ML)<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1.      Plaintiff Laura Peek ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her undersigned attorneys, brings this Class Action Complaint against Defendant Beech-Nut Nutrition Company ("Beech-Nut" or "Defendant"), for its negligent, reckless, and/or intentional practice of misrepresenting and failing to fully disclose the presence (or material risk of) heavy metals in its baby food sold throughout the United States.  Plaintiff seeks both injunctive and monetary relief on behalf of the proposed Class (as defined herein), including requiring full disclosure of all such substances in its marketing, advertising, and labeling and restoring monies to the members of the proposed Class. Plaintiff alleges the following based upon personal knowledge as well as investigation by her counsel, and as to all other matters, upon information and belief (Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery).

**NATURE OF THE ACTION**

2.      Parents like Plaintiff trust manufacturers like Defendant to sell baby food that is safe, nutritious, and free from harmful toxins, contaminants, and chemicals. They certainly expect

the food they feed their infants and toddlers to be free from Heavy Metals and Perchlorate, substances known to have significant and dangerous health consequences.[1]

3.      Consumers lack the scientific knowledge necessary to determine whether the Defendant's products do in fact contain (or have a material risk of) Heavy Metals and Percholate or to know or ascertain the true nature of the ingredients and quality of the Products. Reasonable consumers therefore must and do rely on Defendant to honestly report what its products contain.

4.      A recent report by the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform reveals that parents' trust has been violated (the "Subcommittee's investigation"). Ex. 1. The Subcommittee's investigation of the seven largest baby food manufacturers in the United States, including Defendant, was spurred by "reports alleging high levels of toxic heavy metals in baby foods" and the knowledge that "[e]ven low levels of exposure can cause serious and often irreversible damage to brain development." Ex. 1 at 2.

5.      As the Subcommittee noted, its investigation disclosed Defendant's "reckless disregard for the health of babies." *Id.* at 43.

6.      Defendant knows that its customers trust the quality of its products and that they expect Defendant's products to be free of Heavy Metals and Perchlorate. It also knows that certain consumers seek out and wish to purchase premium baby foods that possess high quality ingredients free of toxins, contaminants, or chemicals and that these consumers will pay more for baby foods they believe possess these qualities than for baby foods they do not believe possess these qualities.

7.      As such, Defendant's promises, warranties, pricing, statements, claims, packaging, labeling, marketing,  advertising, and material nondisclosures (hereinafter collectively referred to

---

[1] As used herein, the phrase "Heavy Metals" is defined as arsenic, cadmium, lead, and mercury.

as "Marketing" or "Claims") (hereinafter collectively referred to as "Marketing" or "Claims") center on representations and pictures that are intended to, and do, convey to consumers that their baby food, including its Contaminated Baby Foods,[2] possess certain qualities and characteristics that justify a premium price.

8.      No reasonable consumer seeing Defendant's Marketing would expect the Contaminated Baby Foods to contain Heavy Metals, Perchlorate, or other undesirable toxins or contaminants. Furthermore, reasonable consumers, like Plaintiff, would consider the mere inclusion of Heavy Metals, Perchlorate, or other undesirable toxins or contaminants a material fact when considering what baby food to purchase.

9.      Defendant intended for consumers to rely on its Marketing, and reasonable consumers did in fact so rely. However, Defendant's Marketing is deceptive, misleading, unfair, and/or false because, among other things, the Contaminated Baby Foods include undisclosed Heavy Metals, Perchlorate, or other undesirable toxins or contaminants.

10.      Defendant's Contaminated Baby Foods do not have a disclaimer regarding the presence of Heavy Metals or other undesirable toxins or contaminants that would inform consumers that the Contaminated Baby Food contain Heavy Metals and Perchlorate and/or that Heavy Metals and Perchlorate can accumulate over time in a child's body to the point where poisoning, injury, and/or disease can occur.

---

[2] The phrase "Contaminated Baby Foods" collectively refers to products sold under the "Beech-Nut Naturals," "Beech-Nut Organics," and "Beech-Nut" brands, including but not limited to the products listed in paragraph 20. These products include purees of fruit, vegetables, meat broths, cereals, fruit and vegetable purees, bars, crisps, and dissolving snacks marketed as "melties." Plaintiff reserves her right to include in this action any products sold by Defendant deemed to contain Heavy Metals and Perchlorate following discovery.

11.     Defendant's wrongful Marketing, which includes misleading, deceptive, unfair, and false Marketing and omissions, allowed it to capitalize on, and reap enormous profits from, consumers who paid the purchase price or a price premium for Contaminated Baby Food that was not sold as advertised. And Defendant continues to wrongfully induce consumers to purchase its Contaminated Baby Food that are not as advertised.

12.     Plaintiff brings this proposed consumer class action individually and on behalf of all other members of the Class (as defined herein) who, from the applicable limitations period up to and including the present, purchased for use and not resale any of Defendant's Contaminated Baby Foods.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over all causes of action asserted herein under the Class Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value or $5,000,000 exclusive of interest and costs and more than two-thirds of the Class resides in states other than the state in which Defendant is a citizen and in which this case is filed, and therefore any exemptions to jurisdiction under 28 U.S.C. §1332(d)(2) do not apply.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Plaintiff suffered injury as a result of Defendant's acts in this district, many of the acts and transactions giving rise to this action occurred in this district, and Defendant conducts substantial business in this district and is headquartered in this district. Defendant has intentionally availed itself of the laws and markets of this district, and Defendant is subject to personal jurisdiction in this district.

## THE PARTIES

15.     Plaintiff is, and at all times relevant hereto has been, a citizen of the state of Wisconsin. She purchased the Contaminated Baby Foods, various flavors of Defendant's organic jarred purees, such as the Beech-Nut Organics Banana & Cinnamon & Granola, and of

Defendant's pouches, such as the Beech-Nut Organic Apple, Sweet Potato, Pineapple & Oat, for her children generally from Target. Plaintiff first purchased the Contaminated Baby Foods in approximately 2009 and last purchased the Contaminated Baby Foods in approximately May 2019.

16.     Plaintiff believed she was feeding her children healthy, nutritious food during the time she purchased and fed her children the Contaminated Baby Foods. Due to the false and misleading claims and omissions by Defendant, she was unaware the Contaminated Baby Foods contained any level of Heavy Metals or Perchlorate and would not have purchased the food if that information had been fully disclosed.

17.     As the result of Defendant's negligent, reckless, and/or knowingly deceptive conduct as alleged herein, Plaintiff was injured when she paid the purchase price or a price premium for the Contaminated Baby Foods that did not deliver what they promised. She paid the purchase price on the assumption that the labeling of the Contaminated Baby Foods was accurate and that it was free of Heavy Metals and Perchlorate and safe to ingest. Plaintiff would not have paid the money had she known that the Contaminated Baby Foods contained excessive degrees of Heavy Metals and Perchlorate. Further, should Plaintiff encounter the Contaminated Baby Foods in the future, she could not rely on the truthfulness of the Marketing, absent corrective changes to the packaging and advertising of the Contaminated Baby Foods. Damages can be calculated through expert testimony at trial.

18.     Defendant Beech-Nut Nutrition Company is incorporated in Delaware with its principal place of business located at 1 Nutritious Place, Amsterdam, New York. Defendant formulates, develops, manufactures, labels, distributes, markets, advertises, and sells the Contaminated Baby Foods under the Beech-Nut name throughout the United States. Defendant

created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the Contaminated Baby Foods.

19.    The Marketing for the Contaminated Baby Foods, relied upon by Plaintiff, was prepared, reviewed, and/or approved by Defendant and its agents at its headquarters in New York and was disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The Marketing for the Contaminated Baby Foods was designed to encourage consumers to purchase the Contaminated Baby Foods and reasonably mislead the reasonable consumer, i.e., Plaintiff and the Class members, into purchasing the Contaminated Baby Foods. Moreover, the quality control, manufacturing and packaging of the Contaminated Baby Food occurred in New York as Defendant's production facility was located in New York throughout the Class Period.

20.    The Contaminated Baby Foods include all flavor profiles or varieties in the following product lines:

      a)    Beech-Nut Naturals® Purees, which includes 24 different types of purees of fruits and vegetables, including:



b)  Beech-Nut® Organics, which includes 16 different types of purees of fruits, vegetables and grains, including:



c)  Beech-Nut® Stage 1 and Stage 2 Purees, which includes 26 different purees of fruit, vegetables, broth, meats and grains, including:



d) Beech-Nut® Naturals Pouches, which includes 6 types of fruit and vegetable purees sold in squeezable pouch form, including:



e) Beech-Nut® and Beech-Nut Organics Cereals, which includes 4 types of infant cereal blends under Beech-Nut® and Beech-Nut Organics brand names, including:



f)  Beech-Nut® Fruities, Veggies and Breakfast Pouches, which includes 14

different types of baby food pouches as "Fruities," "Veggies" and "Breakfast"

purees that contain various combinations of fruits, vegetables, and yogurt,

including:



g)  Beech-Nut Naturals® Bars, which includes 4 types of toddler snack bars

containing combinations of fruit, grain and vegetables under the Beech-Nut

Naturals® Brand, including:



h) Beech-Nut® and Beech-Nut Naturals® "Melties," which includes 4 types of dissolving baby snacks as "melties" under the Beech-Nut® and Beech-Nut Naturals® brands, including:



i) Beech-Nut Naturals® Baked Cheese Bites and Baked Veggie Crisps:

 

## FACTUAL ALLEGATIONS

### I.    A Congressional Investigation Found the Presence of Heavy Metals in Baby Foods

21.    On February 4, 2021, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, published a report

detailing its findings that Heavy Metals—including arsenic, cadmium, lead, and mercury—were present in "significant levels" in numerous commercial baby food products. Ex. 1.

22.     Defendant was one of the baby food manufacturers from whom the Subcommittee requested and obtained internal documents and test results. The investigation found the following with respect to heavy metals:

a)     **Arsenic**: Defendant "used ingredients after they tested as high as 913.4 ppb arsenic" and "routinely used high-arsenic additives that tested over 300 ppb arsenic to address product characteristics such as 'crumb softness.'" *Id*. at 3. "Beech-Nut set internal arsenic and cadmium standards at 3,000 ppb in additives, such as vitamin mix, and 5,000 ppb lead for certain ingredients like BAN 800. These standards are the highest of any responding manufacturer." *Id*. at 4.

b)     **Lead**: Defendant "used ingredients containing as much as 886.9 ppb lead. It used many ingredients with high lead content, including 483 that contained over 5 ppb lead, 89 that contained over 15 ppb lead, and 57 that contained over 20 ppb lead." *Id*.   "Internal testing data from Gerber, Nurture, ***Beech-Nut,*** and Hain demonstrate that all four companies sold products or used ingredients with significant amounts of lead. Only Nurture routinely tested its finished product for lead. Hain, ***Beech-Nut***, and Gerber did not test their finished products, only their ingredients. All companies, whether they test their final products or merely their ingredients, sold baby foods even when they or their ingredients contained unsafe levels of lead." Ex. 1 at 22 (emphasis added).

c)     **Cadmium**: Defendant "used 105 ingredients that tested over 20 ppb cadmium. Some tested much higher, up to 344.55 ppb cadmium." *Id*.

d)   **Mercury**: Defendant "do[es] not even test for mercury in baby food." *Id.* at 4.

23.   The investigation found that, when baby food manufacturers were left to self-regulate and establish their own Heavy Metals standards, they routinely failed to abide by their own standards and that the "[i]nternal company standards permit dangerously high levels of toxic heavy metals," and manufacturers, like Defendant, "have often sold foods that exceeded those levels." *Id*.

24.   Indeed, Defendant's "standards [were] the highest [i.e., least stringent] of any responding manufacturer." *Id*.

25.   In its conclusion, the Subcommittee stressed the danger associated with the presence of Heavy Metals in baby food: "These toxic heavy metals pose serious health risks to babies and toddlers. Manufacturers knowingly sell these products to unsuspecting parents, in spite of internal company standards and test results, and without any warning labeling whatsoever." *Id.*at 58.

## II.   Perchlorate Presents Additional Serious Risks to Infants and Children

26.   Perchlorate "is a rocket fuel component used since the Cold War."[3] The dangers of perchlorate in human food are recognized by the FDA.[4] It "disrupts thyroid functions crucial to brain development," yet "[l]evels in children's food [have] increased dramatically" in recent years.[5]

---

[3]   Healthy Babies Bright Futures Report, at 8. Available at: https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (last visited Feb. 9, 2021).

[4]   FDA, Exploratory Survey Data on Perchlorate in Food 2004-2005, https://www.fda.gov/food/chemicals/exploratory-survey-data-perchlorate-food-2004-2005

[5] Healthy Babies Bright Futures Report, at 8.

27.     Test "results suggest a prevalence that could pose risks during pregnancy and infancy."[6] One lab "detected it in 19 of 25 foods tested,"[7] including in food manufactured and sold by Defendant:[8]

| Brand | Food | Food type | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) | Metro area where purchased | Retailer |
|---|---|---|---|---|---|---|---|---|---|
| **Infant cereal: rice** | | | | | | | | | |
| Beech-Nut | Rice Single Grain Baby Cereal - Stage 1, from about 4 months | Cereal - rice | 117 | 86 | 3.5 | 5.4 | 0.582 | Charlottesville, VA | Wegmans |

---

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Vegetable - single, sweet potato** | | | | | | | | | |
| Beech-Nut | Naturals Just Sweet Potatoes - Stage 1, from about 4 months | Veggie - single - sweet potato | 2.4 * | -- | 14.1 | 4 | < 0.136 | Albany, NY | buybuyBABY |
| Beech-Nut | Organics Just Sweet Potatoes - Stage 1, from about 4 months | Veggie - single - sweet potato | 3.8 * | -- | 7.3 | 2.7 | < 0.142 | Cincinnati, OH | Kroger |
| Beech-Nut | Classics Sweet Potatoes - Stage 2, from about 6 months | Veggie - single - sweet potato | 2.8 * | -- | 24.1 | 3.4 | < 0.138 | Portland, OR | Fred Meyer |

28.     Despite the presence, or ever increasing risk of presence, of Perchlorate in its Contaminated Baby Foods, the cornerstone of Defendant's labels and marketing is its "Natural" ingredients. The presence, or risk of presence, of Perchlorate is directly contrary to Defendant's "Naturals" promise.

## III.    Defendant Falsely Marketed Its Contaminated Baby Foods as Healthy While Omitting Any Mention of Heavy Metals or Perchlorate

29.     Defendant packages, labels, markets, advertises, formulates, manufactures, distributes, and sells its Contaminated Baby Foods throughout the United States, including New York.

30.     Defendant is aware that "parents know that what they feed their baby will have a **lifelong** impact" and touts that it is aware of "scientific research" that "confirm[s] those instincts."[9]

---

[6] *Id.*

[7] *Id.*

[8] *Id.* at 19, 20.

[9] https://www.beechnut.com/blog/baby-eats-now-matters-lot/ (last accessed Feb. 9, 2021).

31.     Defendant's uses its trademarked slogan "Real Food For Babies" because Defendant knows that parents desire to serve healthy, uncontaminated food to their infants and children.[10] Defendant repeatedly touts its commitment to and use of organic and non-GMO ingredients in its products, including the Contaminated Baby Foods.

32.     While Defendant encourages consumers to "read the front AND the back of the label, so you know exactly what's inside your baby's food,"[11] it fails to disclose the inclusion of Heavy Metals or Perchlorate altogether on its packaging.

33.     Based on Defendant's decision to advertise, label, and market its Contaminated Baby Foods as appropriate for various "stages" of development, it had a duty to ensure that the statements and messaging portrayed on the labels were true and not misleading.

34.     The Contaminated Baby Foods are available at numerous retail and online outlets. The Contaminated Baby Foods are widely advertised, and Defendant even publishes a blog that it links to on its site for "Infant Nutrition." That blog includes the claim: "We know how important it is for parents to feel good about what they feed their babies, so Beech-Nut goes the extra mile."[12]

35.     As discussed above, the Marketing of the Contaminated Baby Foods during the Class period also failed to disclose that they contain or are at risk or containing any level of Heavy Metals, Perchlorate, or other undesirable toxins or contaminants. Defendant intentionally omitted these contaminants in order to induce and mislead reasonable consumers to purchase its Contaminated Baby Foods.

---

[10] https://www.beechnut.com/ (last accessed Feb. 9, 2021).

[11] https://www.beechnut.com/blog/label-decoder-natural-organic-means-babys-food/ (last accessed Feb. 9, 2021)

[12] https://www.beechnut.com/blog/label-decoder-natural-organic-means-babys-food/ (last accessed Feb. 9, 2021)

36.     Defendant claims that they have been testing their ingredients for Heavy Metals and other contaminants since 1985, are "aware of no higher standards in the industry than [theirs], and that it goes "above and beyond 'the standard.'"[13]

37.     However, Defendant does not test its food for mercury and has among the lowest standards in the industry for lead and cadmium. Ex. 1 at 33, 37-38.

38.     As a result of Defendant's omissions, a reasonable consumer would have no reason to suspect the presence of Heavy Metals or Perchlorate in the Contaminated Baby Foods without conducting his or her own scientific tests or reviewing third party scientific testing of these products.

**IV.     Defendant's Marketing Misled and Deceived Consumers**

39.     Defendant's Marketing wrongfully conveys to consumers that its Contaminated Baby Foods have certain superior quality and characteristics that they do not actually possess.

40.     For instance, although Defendant misleadingly causes consumers to believe its Contaminated Baby Foods do not contain Heavy Metals or Perchlorate through its Marketing and omissions, the Contaminated Baby Foods do in fact contain undisclosed Heavy Metals, which is material information to reasonable consumers.

41.     For example, the following foods were tested and found to contain undisclosed Heavy Metals at the following levels:[14]

---

[13] https://www.beechnut.com/food-quality-safety/ (last accessed Feb. 9, 2021).

[14] The following chart represents the levels of Heavy Metals in Defendant's products included in the Healthy Babies Bright Futures Report, dated October 2019. Available at: https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (last accessed Feb. 8, 2021).

| Food | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) |
|---|---|---|---|---|---|
| Rice Single Grain Baby Cereal - Stage 1, from about 4 months | 117 | 86 | 3.5 | 5.4 | 0.582 |
| Classics Sweet Carrots - 2 | <2.1 | -- | 27.2[15]* | 6.8 | 0.15 |
| Classics Sweet Carrots - Stage 2 | <2.2 | -- | 23.5 | 8 | 0.212* |
| Organics Just Carrots - Stage 1 | 2.8* | -- | 1.3* | 1.4* | 0.142* |
| Naturals Just Sweet Potatoes - Stage 1, from about 4 months | 2.4* | -- | 14.1 | 4 | 0.136 |
| Organics Just Sweet Potatoes - Stage 1, from about 4 months | 3.8* | -- | 7.3* | 2.7 | <0.142 |
| Classics Sweet Potatoes - Stage 2, from about 6 months | 2.8* | -- | 24.1 | 3.4 | <0.138 |
| Classics Sweat Peas - Stage 2 | 6.3* | -- | 1.1* | 1.6* | < 0.138 |
| Beechnut Naturals Just Butternut Squash - Stage 1 | < 2.2 | -- | 1.3* | 1.2* | < 0.139 |
| Organic Just Pumpkin - Stage 1, from about 4 months | 2.6* | -- | 4 | 1.1* | < 0.139 |
| Organic Just Apples - Stage 1, from about 4 months | < 2 | -- | < 0.5 | < 0.5 | < 0.126 |
| Naturals Bananas - Stage 1, from about 4 months | < 2.1 | -- | < 0.5 | < 0.5 | < 0.136 |

[15] An "*" indicates that test results were estimated, between the limit of detection and the limit of quantitation.

| Food | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) |
|---|---|---|---|---|---|
| Naturals Beets, Pear & Pomegranate - 2 | < 2.2 | -- | 0.9* | 4.7 | < 0.139 |
| Classics Mixed Vegetables - Stage 2 | < 2.2 | -- | 17.9 | 8.6 | < 0.139 |
| Classics Chicken & Chicken Broth - 1 | < 2.2 | -- | < 0.5 | < 0.5 | < 0.137 |
| Classics Turkey and Turkey Broth - Stage One | < 2 | -- | 1* | < 0.5 | < 0.128 |
| Breakfast On-the-Go Yogurt, Banana & Mixed Berry Blend - Stage 4 from about 12 months | < 2.2 | -- | 0.7* | < 0.5 | < 0.139 |

42.     Defendant's Marketing wrongfully fails to disclose to consumers the presence of Heavy Metals and Perchlorate in its Contaminated Baby Foods.

43.     Based on Defendant's Marketing, a reasonable consumer would not suspect the presence of Heavy Metals or Perchlorate, nor would a reasonable consumer be able to detect the presence of Heavy Metals or Perchlorate in the Contaminated Baby Foods without conducting his or her own scientific tests or reviewing scientific testing conducted on the Products.

44.     Reasonable consumers must and do rely on Defendant to honestly report what its Contaminated Baby Foods contain.

45.     In light of Defendant's Marketing, including its "comprehensive" quality controls, Defendant knew or should have known the Contaminated Baby Foods contained Heavy Metals and Perchlorate.

46.     Defendant intended for consumers to rely on its Marketing, and reasonable consumers did in fact so rely.

47.     Defendant had a duty to ensure the Contaminated Baby Foods were as they were represented and not deceptively, misleadingly, unfairly, and falsely marketed.

48.     Pursuant to the foregoing, Defendant's Marketing is deceptive, misleading, unfair, and false to Plaintiff and other consumers, including under the consumer protection laws of California.

49.     Defendant acted negligently, recklessly, unfairly, and/or intentionally with its deceptive, misleading, unfair, and false Marketing and omissions.

## V.     Why Defendant's Marketing and Omissions are Misleading

50.     At all times during the Class Period, Defendant knew or should have known the Contaminated Baby Foods contained Heavy Metals and Perchlorate and were not sufficiently tested for the presence of Heavy Metals and Perchlorate.

51.     Defendant's Contaminated Baby Foods had a risk of containing Heavy Metals and Perchlorate due to Defendant's failure to monitor for their presence in the ingredients and finished products, and Defendant's use of ingredients that exceed its own lax internal guidelines for some Heavy Metals. Defendant was aware of this risk and failed to disclose it to Plaintiff and the Class.

52.     Defendant knew that Heavy Metals and Perchlorate are potentially dangerous contaminants that poses health risks to humans.

53.     A sampling of raw material sampling shows Defendant utilizes ingredients containing Heavy Metals:

| Date | Commodity | Preshipment | Arsenic result (ppb) | Spec. | Cadmium result (ppb) | Spec. | Lead result (ppb) | Spec. | Acceptance (Y/N) |
|---|---|---|---|---|---|---|---|---|---|
| 12/20/2017 | BAN 800 | 786 | 465.20 | <3000 | 6.30 | <500 | <58 | <5000 | Y |
| 1/23/2019 | ascorbic acid | 80 | <5 | <3000 | <1 | <3000 | <5 | <3000 | Y |
| 10/7/2017 | BAN 800 | 673 | 710.90 | <3000 | 8.30 | <500 | <5 | <5000 | Y |
| 10/23/2017 | BAN 800 | 712 | 401.40 | <3000 | 6.10 | <500 | <5 | <5000 | Y |
| 2/19/2018 | BAN 800 | 120 | 382.00 | <3000 | <5 | <500 | <5 | <5000 | Y |
| 6/12/2018 | Ban 800 | 292 | 353.80 | <3000 | <5 | <500 | <5 | <5000 | Y |
| 3/12/2018 | BAN 800 | 164 | 29.70 | <3000 | <5 | <500 | <5 | <5000 | Y |
| 2/6/2017 | Vitamin Mix | 76 | 106.90 | <3000 | 60.30 | <3000 | 24.6 | <10 | Y |
| 1/31/2017 | Vitamin Mix | 72 | 89.40 | <3000 | 48.20 | <3000 | 18 | ≤20 | Y |
| 10/10/2019 | BAN 800 | 680 | 91.10 | <3000 | 28.40 | <500 | 7.5 | <5000 | Y |
| 12/5/2018 | ascorbic acid | 1084 | <5 | <3000 | <5 | <3000 | 6 | <3000 | Y |
| 9/4/2019 | BAN 800 | 442 | 59.70 | <3000 | 11.00 | <500 | 5.8 | <5000 | Y |

54.     Defendant knew or should have known that it owed consumers a duty of care to prevent, or at the very least, minimize the presence of Heavy Metals and Perchlorate in the Contaminated Baby Foods to the extent reasonably possible.

55.     Defendant knew or should have known it owed consumers a duty of care to adequately test for Heavy Metals and Perchlorate in the Contaminated Baby Foods.

56.     Defendant knew consumers purchased the Contaminated Baby Foods based on the reasonable expectation that Defendant manufactured the Contaminated Baby Foods to the highest standards. Based on this expectation, Defendant knew or should have known consumers reasonably inferred that Defendant would hold the Contaminated Baby Foods to the highest standards for preventing the inclusion of Heavy Metals and Perchlorate in the Contaminated Baby Foods and for the Heavy Metals and Perchlorate testing of the ingredients in the Contaminated Baby Foods as well as the final product.

57.     Arsenic is an odorless and tasteless element that does not degrade or disappear. Arsenic occurs in the environment and can be found in rocks, soil, water, air, plants, and animals. Inorganic arsenic is highly toxic and a known cause of human cancers. Arsenic exposure can also cause respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and

immunological effects, and damage children's central nervous systems and cognitive development. Ex. 1 at 9-10. Based on the risks associated with exposure to higher levels of arsenic, both the U.S. Environmental Protection Agency ("EPA") and U.S. Food and Drug Administration ("FDA") have set limits concerning the allowable limit of arsenic at 10 parts per billion ("ppb") for human consumption in apple juice (regulated by the FDA) and drinking water (regulating by the EPA).

58.     Defendant tests for arsenic contents only in its ingredients, not its final product. Ex. 1 at 17. The Subcommittee's investigation determined that Defendant "used ingredients containing as much as 913.4 ppb arsenic. Test results show that Beech-Nut used at least fourteen other ingredients containing over 300 ppb arsenic. And it used at least 45 ingredients containing over 100 ppb arsenic." *Id.*

59.     The "six ingredients with the highest arsenic levels—Amylase, Amylase, BAN 800, Alpha Amylase, and Sebamyl 100—are all enzymes that Beech-Nut adds to its products. BAN 800 is an enzyme that reportedly "increases crumb softness" in baked goods. Amylase is an enzyme that is used in bread-making as an additive to improve the conversion of complex sugars into simple sugars." *Id.* (internal quotations omitted).

60.     The Subcommittee's investigation determined that Defendant's use of "high-arsenic additives to address issues like crumb softness" are unnecessary. *Id.*

61.     The Subcommittee's investigation also determined that Defendant had the highest internal standard for arsenic levels of any of the responding manufacturers. In fact, Defendant "set an internal specification limit [] of 3,000 ppb inorganic arsenic for certain ingredients, including vitamin mix." *Id.* at 37. "As a result of adopting this high internal standard, Beech-Nut has used ingredients containing 710.9, 465.2, and 401.4 ppb arsenic." *Id.* at 37-38.

62.     Lead is a carcinogen and developmental toxin known to cause health problems in children such as behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth. Because lead can build up in the body over time as one is exposed to and/or ingests it, even a low level of chronic exposure can become toxic and seriously injurious to one's health. The FDA has set standards that regulate the maximum parts per billion of lead permissible in water: bottled water cannot contain more than 5 ppb of total lead or 10 ppb of total arsenic. *See* 21 C.F.R. § 165.110(b)(4)(iii)(A).

63.     The Subcommittee's investigation found that baby food manufacturers, like Defendant, "are selling baby food with higher levels of lead than what is allowed by existing standards for water, juice, and candy. Internal testing data from [] Beech-Nut [] [it]sold products or used ingredients with significant amounts of lead." Ex. 1 at 22. Further, the Subcommittee's investigation determined that Defendant did not even test its finished product for lead, and "sold baby foods even when they or their ingredients contained unsafe levels of lead." *Id.*

64.     Defendant uses ingredients, like cinnamon, that contained as much as 886.9 ppb lead. *Id.* at 23. It also "routinely used ingredients with high lead content," including (a) "57 ingredients that contained over 20 ppb lead," which is the European Union's "lax standard for lead in infant formula," (b) "89 ingredients that contained over 15 ppb lead, [the] EPA's action level of drinking water, and (c) 483 ingredients that contained over 5 ppb lead, the FDA's standard for lead in bottled water." *Id.*

65.     The Subcommittee's investigation also determined that Defendant had the highest internal standard for lead levels of any of the responding manufacturers. In fact, Defendant "set internal guidelines of 5,000 ppb for lead for certain ingredients," which "far surpass[es] any

existing regulatory standard in existence and toxic heavy metal levels for any other baby food manufacturer that responded to the Subcommittee's inquiry." *Id.* at 37-38.

66.     Cadmium is associated with decreases in IQ and the development of ADHD. The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens and the EPA has likewise determined that cadmium is a probable human carcinogen. It has been specifically noted that "Kidney and bone effects have … been observed in laboratory animals ingesting cadmium."

67.     The Subcommittee investigation determined that Defendant uses "twenty ingredients registering over 100 ppb cadmium, including cinnamon containing 344.5 ppb cadmium," levels that are "more than 17 times higher than the EU's lax upper limit on cadmium in baby food." Ex. 1 at 28-29. It also uses "[a]t least 105 ingredients that [] registered at or over 20 ppb cadmium—the EU's lax infant formula upper limit." *Id.* at 29.

68.     The Subcommittee's investigation also determined that Defendant had the highest internal standard for cadmium levels of any of the responding manufacturers. In fact, Defendant "set internal guidelines of 3,000 ppb for cadmium" for certain ingredients, which "far surpass[es] any existing regulatory standard in existence and toxic heavy metal levels for any other baby food manufacturer that responded to the Subcommittee's inquiry." *Id.* at 37-38.

69.     Despite its own lax internal guideline for cadmium, Defendant "sold eleven products that surpassed its own internal cadmium limits. By doing so, Beech-Nut accepted dehydrated potato containing 119.6, 143.5, and 148.4 ppb cadmium, far surpassing its own internal limit of 90 ppb for that ingredient[:]"

| Date | Commodity | Preshipment | Arsenic result (ppb) | Spec. | Cadmium result (ppb) | Spec. | Lead result (ppb) | Spec. | Acceptance (Y/N) |
|---|---|---|---|---|---|---|---|---|---|
| 1/11/2018 | Oat Flour | 38 | 47.00 | ≤40 | 21.80 | ≤20 | <5 | ≤20 | Y |
| 1/16/2018 | Coarse Oat Flour | 45 | 45.60 | ≤40 | 20.70 | ≤20 | <5 | ≤20 | Y |
| 6/22/2018 | Org. Oat Flour | 299 | 24.00 | ≤40 | 20.80 | ≤20 | <5 | ≤20 | Y |
| 7/5/2018 | oat flour | 299 | 24.00 | ≤40 | 20.80 | ≤20 | <5 | ≤20 | |
| 3/13/2018 | Coarse Oat Flour | 168 | 23.40 | ≤40 | 20.70 | ≤20 | <5 | ≤20 | Y |
| 10/1/2019 | Oat Flour | 645 | 20.90 | ≤40 | 20.90 | ≤20 | <5 | ≤20 | Y |
| 9/13/2019 | Oat Flour | 554 | 18.20 | ≤40 | 22.30 | ≤20 | <5 | ≤20 | Y |
| 10/10/2018 | Dehydrated Potato | 816 | 11.30 | <75 | 143.50 | <90 | 32.4 | <75 | Y - ER |
| 11/29/2017 | Dehydrated Potato | 760 | 9.30 | <75 | 148.40 | <90 | 10.1 | <75 | Y - ER |
| 1/30/2018 | Org. Oat Flour | 73 | 8.50 | ≤40 | 21.70 | ≤20 | <5 | ≤20 | Y - ER |
| 11/29/2017 | Dehydrated Potato | 749 | 7.60 | <75 | 119.60 | <90 | <5 | <75 | Y - ER |

*Id.* at 39.

70.    The Subcommittee indicated that "Beech-Nut's explanation of why it accepted products over its own internal limits was that it did so 'rarely' and the ingredients were 'generally restricted to a 20% variance of BNN's allowable limits….' *Id.* However, testing revealed that Defendant "accepted certain ingredients in spite of their own testing results which showed that they contained over 20% more cadmium than their already-high internal limit." *Id.* For example, Defendant's "internal limit for cadmium in dehydrated potato appears to be 90 ppb. A 20% variance would permit Beech-Nut to accept dehydrated potato containing up to 108 ppb cadmium. Nevertheless, Beech-Nut accepted three shipments of dehydrated potato containing cadmium in excess of its 20% variance allowance." *Id.* Defendant "did not offer any explanation" as to why this ingredient exceeded the 20% variance. *Id.*

71.    Mercury is a known toxin, and pre-natal exposure has been associated with affected neuro-development, a lowered IQ, and autistic behaviors. The impact of the various ways humans and animals are exposed and ingest mercury has been studied for years. In fact, in as early as 1997, the EPA issued a report to Congress that detailed the health risks to both humans and animals.

Based on the toxicity and risks of mercury, regulations have been enacted at both the Federal and state level.

72.     Defendant does not test its ingredients nor its finished baby food products for mercury. *Id.* at 33.

73.     While federal regulations regarding levels of Heavy Metals in most baby foods are non-existent, it is not due to a lack of risk. According to Linda McCauley, Dean of the Nell Hodgson Woodruff School of Nursing at Emory University, who studies environmental health effects, stated, "No level of exposure to these [heavy] metals has been shown to be safe in vulnerable infants."[16]

74.     Based on the foregoing, reasonable consumers, like Plaintiff, would consider the inclusion of Heavy Metals and Perchlorate a material fact when considering what baby food to purchase.

75.     Defendant knew that properly and sufficiently monitoring for Heavy Metals and Perchlorate in its ingredients and Contaminated Baby Foods was not only important but critical.

76.     Defendant also knew that monitoring Heavy Metals and Perchlorate was likewise important to its health-conscious consumers.

77.     Finally, Defendant knew or should have known it could control the levels of Heavy Metals and Perchlorate in the Contaminated Baby Foods by properly monitoring its ingredients for Heavy Metals and Perchlorate and adjusting any formulation or diet to reduce ingredients that contained higher levels of Heavy Metals and Perchlorate.

---

[16] https://www.nytimes.com/2021/02/04/health/baby-food-metals-arsenic.html (last accessed Feb. 9, 2021).

78.     However, Defendant also knew it was not properly and sufficiently testing for Heavy Metals and Perchlorate in the Contaminated Baby Foods. Defendant knew its failure to properly and sufficiently test for Heavy Metals and Perchlorate in the Contaminated Baby Foods continued throughout the Class Period.

79.     Defendant's Marketing was misleading due to its failure to properly and sufficiently monitor for and to disclose the risk of the presence of Heavy Metals and Perchlorate in the Contaminated Baby Foods.

80.     Defendant knew or should have known consumers paid premium prices and expected Defendant to regularly test for Heavy Metals and Perchlorate and sufficiently monitor the presence of Heavy Metals and Perchlorate in the Contaminated Baby Foods and ingredients.

81.     At all times during the Class Period, Defendant did not consistently monitor or test for Heavy Metals and Perchlorate in the Contaminated Baby Foods and ingredients. In fact, as the Subcommittee investigation revealed, Defendant never tests its finished product, Ex. 1 at 56 and does not test its ingredients at all for mercury, *id.* at 33. "That policy recklessly endangers babies and children and prevents the companies from even knowing the full extent of the danger presented by their products." *Id.* at 56-57. Indeed, "only testing ingredients gives the false appearance of lower-than-actual toxic heavy metal levels." *Id.*

82.     Defendant knew or should have known that consumers reasonably expected it to test for and monitor the presence of Heavy Metals and Perchlorate in the Contaminated Baby Foods and ingredients.

83.     Defendant knew or should have known the Contaminated Baby Foods contained unmonitored levels of Heavy Metals and Perchlorate that were inconsistent with their Marketing.

84.     Defendant knew or should have known that consumers expected it to ensure the Contaminated Baby Foods were monitored and tested for Heavy Metals and Perchlorate to ensure compliance with their Marketing.

85.     Defendant knew, yet failed to disclose, its lack of regular testing and knowledge of the risk or presence of Heavy Metals and Perchlorate in the Contaminated Baby Foods and ingredients.

86.     Defendant's above-referenced statements, representations, partial disclosures, and omissions are false, misleading, and crafted to deceive the public as they create an image that the Contaminated Baby Foods are healthy, nutritious, and made from the best ingredients, are subject to stringent quality control, and are free of Heavy Metals and Perchlorate.

87.     Moreover, reasonable consumers, such as Plaintiff and the Class members, would have no reason to doubt Defendant's statements regarding the quality of the Contaminated Baby Foods. Defendant's nondisclosure and/or concealment of the toxins in the Contaminated Baby Foods coupled with the misrepresentations alleged herein that were intended to and did, in fact, cause consumers like Plaintiff and the members of the Class, to purchase products they would not have if the true quality and ingredients were disclosed or would not have paid a premium price for such baby food.

88.     As a result of Defendant's wrongful Marketing, which includes misleading, deceptive, unfair, and false statements and omissions, Defendant has generated substantial sales of the Contaminated Baby Foods.

89.     Defendant's wrongful Marketing, which includes misleading, deceptive, unfair, and false representations and omissions, allowed it to capitalize on, and reap enormous profits

from, consumers who paid the purchase price or premium for the Products that were not as advertised.

90.     This is not surprising given that, for example, that the baby food market in the United States was valued at $12.9 billion in 2018 and was expected to increase to $17.2 billion by 2026,[17] and organic baby food was valued at $1.9 billion in the U.S. in 2018 and is expected to reach $3.32 billion by 2024.[18]

91.     The incredible rise in consumer demand for organic baby food is "driven by the growing awareness among consumers to limit that baby's exposure to the harmful chemicals used in conventional food production and the awareness of the benefits of organic products."[19]

**DEFENDANT'S STATEMENTS AND OMISSIONS VIOLATE NEW YORK LAWS**

92.     New York law is designed to ensure that a company's claims about its products are truthful and accurate.

93.     Defendant violated New York law by negligently, recklessly, and/or intentionally incorrectly claiming that the Contaminated Baby Foods are healthy, nutritious, and "made from the best ingredients," appropriate for various "stages" of development, and by not accurately detailing that the products contain Heavy Metals and Perchlorate.

---

[17]     https://www.globenewswire.com/news-release/2020/01/16/1971596/0/en/U-S-Baby-Food-Market-by-Product-Type-and-Distribution-Channel-Opportunity-Analysis-and-Industry-Forecast-2019-2026.html (last accessed Feb. 9, 2021).

[18]     https://www.businesswire.com/news/home/20200120005436/en/North-America-Organic-Baby-Food-Market-Expected-to-Reach-a-Value-of-3.32-Billion-by-2024-with-a-CAGR-of-9.6---ResearchAndMarkets.com (last accessed Feb. 8, 2021).

[19]     https://www.mordorintelligence.com/industry-reports/organic-baby-food-market (last accessed Feb. 9, 2021).

94.     Defendant's marketing and advertising campaign has been sufficiently lengthy in duration, and widespread in dissemination, that it would be unrealistic to require Plaintiff to plead relying upon each advertised misrepresentation.

95.     Defendant has engaged in this long-term advertising campaign to convince potential customers that the Contaminated Baby Foods were healthy, nutritious, and "made from the best ingredients," appropriate for various "stages" of development, and did not contain harmful ingredients, such as Heavy Metals and Perchlorate.

## PLAINTIFF'S RELIANCE WAS REASONABLE AND FORESEEN BY DEFENDANT

96.     Plaintiff reasonably relied on Defendant's claims, warranties, representations, advertisements, and other marketing concerning the particular qualities and benefits of the Contaminated Baby Food.

97.     Plaintiff read and relied upon the labels and packaging of the Contaminated Baby Foods when making her purchasing decisions. Had she known Defendant omitted the presence of Heavy Metals and Perchlorate from its packaging, she would not have purchase it.

98.     A reasonable consumer would consider the labeling of a product when deciding whether to purchase. Here, Plaintiff relied on the specific statements and omissions on the Contaminated Baby Foods' labeling that led her to believe it was healthy, nutritious, and free of Heavy Metals and Perchlorate.

## DEFENDANT'S KNOWLEDGE AND NOTICE OF ITS BREACHES OF ITS EXPRESS AND IMPLIED WARRANTIES

99.     Defendant had sufficient notice of its breaches of express and implied warranties. Defendant has, and had, exclusive knowledge of the physical and chemical make-up of the Contaminated Baby Foods. Moreover, Defendant was put on notice by the Healthy Babies Bright

Future Report about the inclusion of Heavy Metals, Perchlorate, or other undesirable toxins or contaminants in the Contaminated Baby Foods.[20]

## PRIVITY EXISTS WITH PLAINTIFF AND THE PROPOSED CLASS

100.    Defendant knew that consumers such as Plaintiff and the proposed Class would be the end purchasers of the Contaminated Baby Foods and the target of its advertising and statements.

101.    Defendant intended that the warranties, advertising, labeling, statements, and representations would be considered by the end purchasers of the Contaminated Baby Foods, including Plaintiff and the proposed Class.

102.    Defendant directly marketed to Plaintiff and the proposed Class through statements on its website, labeling, advertising, and packaging.

103.    Plaintiff and the proposed Class are the intended beneficiaries of the expressed and implied warranties.

## CLASS ACTION ALLEGATIONS

104.    Plaintiff brings this action individually and on behalf of the following Class pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All persons who, from February 10, 2015, to the present, purchased the Contaminated Baby Foods for household or business use, and not for resale (the "Class").

105.    Plaintiff also brings this action individually and on behalf of the following Subclass pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

---

[20] Nonprofit organization, Healthy Babies Bright Futures, published a report based on a scientific study of the presence of Heavy Metals in baby foods. https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (last accessed Feb. 9, 2021).

All persons who are citizens of Wisconsin who, from February 10, 2015, to the present, purchased the Contaminated Baby Foods for household or business use, and not for resale (the "Wisconsin Class" or "Subclass").

106.    Excluded from the Class and Subclass (collectively, "Classes") is the Defendant; any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, and employees; co-conspirators; all governmental entities; and any judge, justice, or judicial officer presiding over this matter.

107.    This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Class are easily ascertainable.

108.    The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the members of all Classes in a single action will provide substantial benefits to the parties and Court.

109.    Questions of law and fact common to Plaintiff and the Class include, but are not limited to, the following:

a)    whether Defendant owed a duty of care;

b)    whether Defendant knew or should have known that the Contaminated Baby Foods contained Heavy Metals and Perchlorate;

c)    whether Defendant represented and continue to represent that the Contaminated Baby Foods are healthy, nutritious, made from the best ingredients, appropriate for various "stages" of development, and safe for consumption;

d)    whether Defendant represented and continues to represent that the manufacturing of its Products is subjected to rigorous quality standards;

e)    whether Defendant failed to disclose that the Contaminated Baby Foods contained Heavy Metals and Perchlorate;

f)      whether Defendant's representations in advertising, warranties, packaging, and/or labeling are false, deceptive, and misleading;

g)      whether those representations are likely to deceive a reasonable consumer;

h)      whether Defendant had knowledge that those representations were false, deceptive, and misleading;

i)      whether Defendant continues to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

j)      whether a representation that a product is healthy, nutritious, made from the best ingredients, appropriate for various "stages" of development, and safe for consumption and does not contain Heavy Metals or Perchlorate is material to a reasonable consumer;

k)      whether Defendant's Marketing of the Contaminated Baby Foods are likely to mislead, deceive, confuse, or confound consumers acting reasonably;

l)      whether Defendant violated the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq.*; and

m)      whether Plaintiff and the members of the Class are entitled to declaratory and injunctive relief.

110.      Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other members of the Class. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

111.     Plaintiff's claims are typical of those of the members of the Class in that they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct.

112.     Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

113.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Class is small such that, absent representative litigation, it would be infeasible for members of the Class to redress the wrongs done to them.

114.     Questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

115.     As a result of the foregoing, class treatment is appropriate.

## **COUNT I**

### **(Negligent Misrepresentation Against Defendant on Behalf of the Class, or alternatively the Subclass pursuant to state law)**

116.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.     Plaintiff reasonably placed her trust and reliance in Defendant's representations that the Contaminated Baby Foods were as Marketed to her and the Class, and were healthy, nutritious, made from the best ingredients, appropriate for various "stages" of development, and safe for consumption, and did not contain Heavy Metals and Perchlorate.

118.     Because of the relationship between the parties, the Defendant owed a duty to use reasonable care to impart correct and reliable disclosures concerning the presence of Heavy Metals and Perchlorate in the Contaminated Baby Foods or, based upon its superior knowledge, having spoken, to say enough to not be misleading.

119.    Defendant breached its duty to Plaintiff and the Class by providing false, misleading, and/or deceptive information regarding the nature of the Contaminated Baby Foods.

120.    Plaintiff and the Class reasonably and justifiably relied upon the information supplied to them by the Defendant. A reasonable consumer would have relied on Defendant's own warranties, statements, representations, advertising, packaging, labeling, and other marketing as to the quality, make-up, and included ingredients of the Contaminated Baby Foods.

121.    As a result of these misrepresentations, Plaintiff and the Class purchased the Contaminated Baby Foods at a premium.

122.    Defendant failed to use reasonable care in its communications and representations to Plaintiff and the Class, especially in light of its knowledge of the risks and importance of considering ingredients to consumers when purchasing the Contaminated Baby Foods.

123.    By virtue of Defendant's negligent misrepresentations, Plaintiff and the Class have been damaged in an amount to be proven at trial or alternatively, seek rescission and disgorgement under this Count.

## COUNT II

**(Violations of New York's Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349, Against Defendant on Behalf of the Class or alternatively the Subclass pursuant to state law)**

124.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.    New York General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

126.    In its sale of goods throughout New York, Defendant conducts business and trade within the meaning and intendment of New York General Business Law § 349.

127.    Defendant violated N.Y. Gen. Bus. Law. § 349 by representing that its Contaminated Baby Foods were healthy, nutritious, "real food for babies," and safe baby foods as promised, which was deceptive because the Contaminated Baby Foods instead had a risk of and/or actual inclusion of Heavy Metals and Perchlorate, including levels that exceed FDA and EPA guidance.

128.    Defendant intentionally represented that the Contaminated Baby Foods were of a particular standard, grade, or quality when they in fact had a risk and/or actual inclusion of Heavy Metals and Perchlorate and were not safe for consumption.

129.    The facts that Defendant concealed or misrepresented were material in that any Plaintiff and any other reasonable consumer would have considered them when deciding whether to purchase the Contaminated Baby Foods.

130.    Defendant's conduct and omissions described herein repeatedly occurred in the course of Defendant's business and were capable of deceiving a substantial portion of the consuming public.

131.    Defendant has engaged and continues to engage in deceptive conduct in violation of the New York General Business Law.

132.    Defendant's misrepresentations and deceptive acts or practices resulted in Plaintiff and other reasonable consumers suffering actual damages when they purchased the Contaminated Baby Foods that were worth less than the price paid and that they would not have purchased at all had they known of the risk and/or actual inclusion of Heavy Metals and Perchlorate.

133.    Defendant intended for Plaintiff and other reasonable consumers to rely on its deceptive misrepresentations and conduct when purchasing its Contaminated Baby Foods.

134.    As a direct and proximate result of these violations, Plaintiff and other reasonable consumers have been harmed, and that harm will continue unless Defendant is enjoined from misrepresenting the quality and ingredients of its Contaminated Baby Foods described herein.

135.    Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff and the Class and/or Subclass seek injunctive and declaratory relief, full refund, actual and punitive damages, and attorneys' fees.

## COUNT III

**(Violations of New York False Advertising Law, N.Y. Gen. Bus. Law § 350, Against Defendant on Behalf of the Class or alternatively the Subclass pursuant to state law)**

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.    New York General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

138.    Pursuant to N.Y. Gen. Bus. Law § 350, false advertising is defined as "advertising, including labeling, or a commodity… if such advertising is misleading in a material respect."

139.    Defendant's claims that the Contaminated Baby Foods were healthy, nutritious, "real food for babies," and safe baby foods as promised were untrue or misleading because such claims failed to disclose that the Contaminated Baby Foods instead had a risk of and/or actual inclusion of Heavy Metals and Perchlorate, including levels that exceed FDA and EPA guidance.

140.    Defendant knew or should have known that such claims were false or misleading.

141.    Such false and misleading claims and representations made by Defendant were material in that Plaintiff and any reasonable consumer would have considered them when deciding to purchase the Contaminated Baby Foods.

142.    Defendant, including its agents and distributors, made untrue, deceptive, and misleading assertions and representations about the alleged quality, characteristics, and nature of the Contaminated Baby Foods.

143.    Defendant's conduct caused Plaintiff and the Class to suffer actual damages when they purchased the Contaminated Baby Foods that were worth less than the price paid and that they would not have purchased at all had they known of the risk and/or actual inclusion of Heavy Metals and Perchlorate, including levels that exceed FDA and EPA guidance.

144.    As a direct and proximate result of Defendant's violation of N.Y. Gen. Bus. Law § 350, Plaintiff and the Class have been injured, and that harm will continue unless Defendant is enjoined from misrepresenting the quality, ingredients, standards, and suitability for consumption of its Contaminated Baby Foods.

145.    Pursuant to N.Y. Gen. Bus. Law § 350, *et seq*., Plaintiff and the Class and/or Subclass seek injunctive and declaratory relief, full refund, actual and punitive damages, and attorneys' fees.

### <u>COUNT IV</u>

**(Violations of the Wisconsin Deceptive Trade Practices Act ("WDTPA"),
Wis. Stat. § 100.18, *et seq*., Against Defendant on Behalf of the Wisconsin
Subclass)**

146.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.    Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Wisconsin Subclass against Defendant.

148.    Defendant willingly engaged in deceptive trade practices, in violation of the ("WDTPA") by:

(a)     Representing its Contaminated Baby Foods have characteristics, ingredients, uses, and benefits they do not have;

(b)     Representing its Contaminated Baby Foods are of a superior standard, quality, and grade when they contain levels of Heavy Metals, Perchlorate, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements; and

(c)     Representing its Contaminated Baby Foods as natural when they contain Perchlorate and other unnatural ingredients; and

(d)     Representing its Contaminated Baby Foods are appropriate for the advertised "stage" when they contain Heavy Metals, Perchlorates, and other ingredients that are not appropriate for that "stage" of development.

149.     Defendant knew or should have known that the Contaminated Baby Foods did not have the ingredients, uses, and benefits described herein because they contain levels of Heavy Metals, Perchlorate, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements.

150.     Defendant knew or should have known the Contaminated Baby Foods were not of a superior standard, quality, or grade because they contain levels of Heavy Metals, Perchlorate, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements that a reasonable consumer would consider material.

151.     Defendant knew or should have known the Contaminated Baby Foods were not natural because they contain material levels of Perchlorate and other unnatural ingredients.

152.     Defendant knew or should have known that the Contaminated Baby Foods were not appropriate for the advertised "stage" because they contain material levels of Heavy Metals, Perchlorates, and other ingredients not appropriate for the advertised "stage."

153.     Defendant's misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff and the

Subclass with respect to the Contaminated Baby Foods' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by infants and children.

154.   Defendant intended for Plaintiff and the Subclass to rely on Defendant's misrepresentations, concealment, warranties, deceptions, and/or omissions regarding the Contaminated Baby Foods' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by infants and children.

155.   Defendant's conduct and omissions described herein occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the consuming public.

156.   The facts concealed or not disclosed by Defendant were material facts in that Plaintiff and any reasonable consumer would have considered them when deciding whether to purchase the Contaminated Baby Foods.  Had Plaintiff known the Contaminated Baby Foods did not have the quality and ingredients advertised by Defendant, she would not have purchased the Contaminated Baby Foods.

157.   Defendant intended for Plaintiff and the Subclass to rely on the deception by purchasing the Contaminated Baby Foods, unaware of the undisclosed material facts.  This conduct constitutes consumer fraud.

158.   Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this fraudulent course of conduct.

159.   As a result of Defendant's conduct, Plaintiff and the Subclass have suffered actual damages in that they purchased Contaminated Baby Foods that were worth less than the price they paid, and that they would not have purchased at all had they known of the levels of Heavy Metals, Perchlorate, toxins, and/or unnatural or other ingredients that do not conform to the products'

labels, packaging, advertising, and statements.  There is an association between Defendant's acts and omissions as alleged herein and the damages suffered by Plaintiff.

160.     As a direct and proximate result of Defendant's violations of the WDTPA, Plaintiff and the Subclass have been injured, and that harm is likely to continue unless Defendant is enjoined from misrepresenting the ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by infants and children of its Contaminated Baby Foods described herein.

161.     Pursuant to Wis. Stat. Ann. § 100.18, Plaintiff and the Subclass seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violation of the WDTPA.

## COUNT V

### (Breach of Express Warranty Against Defendant on Behalf of the Class or alternatively the Subclass pursuant to state law)

162.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.     As set forth herein, Defendant made express representations to Plaintiff and the Class that the Contaminated Baby Foods were healthy, nutritious, "real food for babies," and safe baby foods.

164.     These promises became part of the basis of the bargain between the parties and thus constituted express warranties.

165.     There was a sale of goods from Defendant to Plaintiff and the Class members.

166.     On the basis of these express warranties, Defendant sold to Plaintiff and the Class members the Contaminated Baby Foods.

167.     Defendant knowingly breached the express warranties by including Heavy Metals and Perchlorate in the Contaminated Baby Foods.

168.    Defendant was on notice of this breach as it was aware of the included Heavy Metals and Perchlorate in the Contaminated Baby Foods, and based on the public investigation by the nonprofit organization, Healthy Babies Bright Futures, that showed its baby food products as containing Heavy Metals and Perchlorate.

169.    Privity exists because Defendant expressly warranted to Plaintiff and the Class that the Contaminated Baby Foods were healthy, nutritious, "real food for babies," and safe baby foods.

170.    Plaintiff and the Class members reasonably relied on the express warranties by Defendant.

171.    As a result of Defendant's breaches of its express warranties, Plaintiff and the Class sustained damages as they paid money for the Contaminated Baby Foods that were not what Defendant represented.

172.    Plaintiff, on behalf of herself and the Class, seek actual damages for Defendant's breach of warranty.

## COUNT VI

**(Breach of Implied Warranty of Merchantability Against Defendant on Behalf of the Class or, alternatively the Subclass pursuant to state law)**

173.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

174.    Defendant is a merchant engaging in the sale of goods to Plaintiff and the Class members.

175.    There was a sale of goods from Defendant to Plaintiff and the Class members.

176.    At all times mentioned herein, Defendant manufactured and/or sold the Contaminated Baby Foods, prior to the time the Contaminated Baby Foods were purchased by Plaintiff and the Class, Defendant impliedly warranted to Plaintiff, and to the Class, that the

Contaminated Baby Foods were of merchantable quality and fit for the use for which they were intended.

177.    Plaintiff and the Class relied on the skill and expertise of Defendant in purchasing and feeding the Contaminated Baby Foods to their children.

178.    The Contaminated Baby Foods were unfit for their intended use and were not of merchantable quality, as warranted by Defendant. Instead, the Contaminated Baby Foods had the risk of and/or actual inclusion of Heavy Metals and Perchlorate, including levels that exceed FDA and EPA guidance.

179.    Defendant breached the implied warranty of merchantability because of the risk and/or actual inclusion of Heavy Metals and Perchlorate, including levels that exceed FDA and EPA guidance in the Contaminated Baby Foods.

180.    Defendant was on notice of this breach as it was aware of the inclusion of Heavy Metals and Perchlorate in the Contaminated Baby Foods, and based on the public investigation by the nonprofit organization, Healthy Babies Bright Futures, that showed its baby food products as containing Heavy Metals and Perchlorate.

181.    Privity exists because Defendant impliedly warranted to Plaintiff and the Class members through the warranting, packaging, advertising, marketing, and labeling that the Contaminated Baby Foods were healthy, nutritious, "real food for babies," and safe baby foods, and by failing to make any mention of Heavy Metals and Perchlorate.

182.    As a result of Defendant's breach of its implied warranties of merchantability, Plaintiff and the Class sustained damages as they paid money for the Contaminated Baby Foods that were not what Defendant represented, in an amount to be determined at trial.

## COUNT VII

### (Breach of Implied Warranty of Fitness for a Particular Purpose Against Defendant on Behalf of the Class alternatively the Subclass pursuant to state law)

183.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184.    At the time of contracting, Defendant had reason to know of Plaintiff's and Class members' particular purpose for purchasing the Contaminated Baby Foods.

185.    Plaintiff and the Class relied on Defendant's skill or judgment to select or furnish suitable goods, thereby creating an implied warranty that the goods would be fit for such purpose.

186.    The Contaminated Baby Foods were not fit for these purposes, thereby causing injuries to Plaintiff and the Class members.

## COUNT VIII

### (Unjust Enrichment Against Defendant on Behalf of the Class or alternatively the Subclass pursuant to state law)

187.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

188.    Substantial benefits have been conferred on Defendant by Plaintiff and the Classes through the purchase of the Contaminated Baby Foods. Defendant knowingly and willingly accepted and enjoyed these benefits.

189.    Defendant either knew or should have known that the payments rendered by Plaintiff were given and received with the expectation that the Contaminated Baby Foods would have the qualities, characteristics, ingredients, and suitability for consumption represented and warranted by Defendant. As such, it would be inequitable for Defendant to retain the benefit of the payments under these circumstances.

190.    Defendant's acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Defendant to retain the benefits without payment of the value to Plaintiff and the Classes.

191.    Plaintiff and the Classes are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant, plus interest thereon.

192.    Plaintiff and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, pray for judgment against the Defendant as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiff and her counsel to represent the Class, and requiring Defendant to bear the costs of class notice;

B.    An order enjoining Defendant from selling the Contaminated Baby Foods until the higher and/or unsafe levels of Heavy Metals and Perchlorate are removed;

C.    An order enjoining Defendant from selling the Contaminated Baby Foods in any manner suggesting or implying that they are healthy, nutritious, and safe for consumption;

D.    An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing products;

E.    An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

F.    An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business

act or practice, untrue or misleading advertising, or a violation of the WDTPA, plus pre- and post-judgment interest thereon;

       G.      An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

       H.      An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein;

       I.      An order requiring Defendant to pay punitive damages on any count so allowable;

       J.      An order awarding attorneys' fees and costs to Plaintiff and the Class; and

       K.      An order providing for all other such equitable relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: February 11, 2021          Respectfully submitted,

                              CUNEO GILBERT & LADUCA, LLP

                              By: *s/ Charles J. LaDuca*
                              Charles LaDuca
                              Katherine Van Dyck
                              C. William Frick
                              4725 Wisconsin Avenue NW, Suite 200
                              Washington, DC 20016
                              Telephone:(202) 789-3960
                              Facsimile: (202) 789-1813
                              E-mail: charles@cuneolaw.com
                                     kvandyck@cuneolaw.com
                                     bill@cuneolaw.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Robert K. Shelquist
Rebecca A. Peterson
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: rkshelquist@locklaw.com
       rapeterson@locklaw.com

LITE DEPALMA GREENBERG, LLC
Joseph DePalma
Susana Cruz Hodge
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
E-mail: jdepalma@litedepalma.com
    scruzhodge@litedepalma.com

*Attorneys for Plaintiff Laura Peek*